STATE OF IOWA, Appellee, v. C. R. METCALFE, Appellant.

HOMICIDE: Assault with Intent to Kill—Self-defense—Defense of
1　Property—Permissible Force. A jury must not be peremptorily told, as a matter of law, in a criminal case not involving a homicide, that the defendant (a private citizen) would not be justified in employing a *deadly weapon* (1) to make an arrest for a felony committed in his presence and within the curtilage of his home, or (2) to prevent the forcible carrying away of his property by the thieves. The essential issue (which must be explained to the jury) is, *not the nature of the weapon employed*, but whether the defendant employed only that degree of force to accomplish such purposes which a reasonable person would deem reasonably necessary under the existing circumstances as they in good faith appeared to the defendant.

HOMICIDE: Self-defense—Defense of Property—Unintended Victim. A
2　defendant who employs a justifiable degree of force to prevent thieves from carrying away his property is not criminally liable if his force, e. g., the discharge of a gun, takes effect on an unintended person.

CRIMINAL LAW: Appeal and Error—Instructions—Presumption. Pre-
3　sumptively, as against appellee, an instruction has support in testimony not abstracted to the appellate court.

Headnote 1: 30 C. J. pp. 34, 85, 392. Headnote 2: 30 C. J. p. 85. Headnote 3: 17 C. J. p. 224.

Headnote 1: 45 L. R. A. (N. S.) 71; 25 A. L. R. 542; 13 R. C. L. 841. Headnote 2: 25 A. L. R. 558; 13 R. C. L. 840.

*Appeal from Woodbury District Court.*—C. C. HAMILTON,
Judge.

DECEMBER 15, 1925.

OPINION ON REHEARING FEBRUARY 18, 1927.

The defendant, upon an indictment for assault with intent
to commit murder, was convicted of an assault with intent to
inflict a great bodily injury. From the judgment upon the
verdict he appeals.—*Reversed.*

*C. R. Metcalfe, pro se.*

*Ben J. Gibson, O. T. Naglestad,* and *W. M. Murphy,* for
appellee.

EVANS, C. J.—The testimony on behalf of the State tended
to show that the prosecuting witness, John Perry, a boy about
13 years of age, and two other boys had been playing, during the
afternoon, in an inclosed chicken yard or pas-
ture of the appellant's; that, about 6:30, as it
was getting dark, they had grown tired of their
play, and were resting; that Perry was lying
down, and was concealed by sunflower stalks;
that the other two boys were standing or sitting near him; that
they were on a bank above appellant's chicken house, which was,
in a general way, between them and appellant's residence; that
the appellant came out of his dwelling, carrying a shotgun, and
fired in the direction of the boys; and that some 15 or more of
the shot struck Perry in the face.

1. HOMICIDE: assault with intent to kill: self-defense: defense of property: permissible force.

The appellant's testimony was to the effect that, about 6:30
in the evening, he heard the chickens squawking, and saw,
through the window of his house, that the hen house door, which
he had just previously closed, was open, and a couple of men
came out of the hen house, with chickens in their hands; that
one of them took chickens off the roof where they were roosting;
that he got his shotgun and went out in the yard; that by that
time the men were going up the bank with the chickens; that
there were four of them; that he said, "Hold on there with
those chickens;" that they jumped and ran with them, and he

shot one barrel of the gun at them as they went up the bank; that it was too dark to recognize them; that they were 85 feet away; that, when he shot, they dropped some of the chickens and ran up the bank with some, and when they were on top, a few feet among the sunflowers, he could not see them; that he did not see any other persons there; that, after he fired the shot, the fellows who had the chickens jumped and ran up the hill, and at the same instant the boys on top of the bank jumped up and ran, and that that was the first time he saw them; that they were on top of the bank behind the sunflowers, and a tree was between him and them, and it was dark under the bank and the tree and sunflowers; but that, when they jumped up, he could see them outlined against the sky, and that was the first time he saw the boys.

The appellant's testimony was corroborated to a considerable extent by two other witnesses, while Perry and the other two boys testified that they saw no one else there, did not hear any chickens, and did not themselves take any chickens. We are not, on this appeal, concerned with this conflict in the testimony. The principal question in the case is whether the court in its instructions correctly gave to the jury the law applicable to the situation of the appellant, if the facts were found to be as testified to by him.

The court instructed, in substance, that the larceny of domestic fowl or poultry from any building, shed, coop, or inclosed premises was a felony; that lawful resistance to the commission of a public offense might be made by the party about to be injured, or by others, and that resistance sufficient to prevent the offense might be made by the party about to be injured, to prevent an offense against his property or to prevent an illegal attempt by force to take or injure property in his lawful possession; and that a private citizen might make an arrest for a public offense committed or attempted in his presence, or where a felony had been committed and he had reasonable grounds for believing that the person to be arrested had committed it.

These instructions declared the statutory law as found in Sections 4852-d, Code Supplement, 1913, and 5102, 5103, and 5197, Code of 1897 (Sections 13015, 12921, 12922, and 13469, Code of 1924). There is no complaint of them; but they, and the statutes upon which they are based, are to be taken into ac-

count in considering other instructions to which objection is made.

The defendant's chicken house was within an inclosure. It was situated to the rear of the defendant's dwelling house, and in the same inclosure. At the rear end of the defendant's lot was a high bluff, about 15 feet high. The south part of this bluff was cut away, so that its south face constituted a wall, against which the chicken house was built. The north end of the lot was, therefore, somewhat higher than the roof of the chicken house. The approach of the alleged trespassers to the defendant's chicken house was over this high ground at the rear. It was upon this high ground, also, that Perry, the injured boy, and his companions lay concealed, immediately prior to the shooting. The nature and extent of the injury inflicted upon Perry were described by the State's witness, Dr. Carney, as follows:

"He was suffering from a gunshot wound in his face and right shoulder, with small shot which had penetrated; he was not suffering much pain; I treated him, and he was in the hospital four days, and discharged."

No other evidence of the extent of the injury was offered. It appears that the gun was loaded with small bird shot. The principal question presented for our consideration involves the adequacy and propriety of the instructions given by the court to the jury.

I. In the first instance, the court gave to the jury the following instruction:

"8b. You are instructed that the statutes of Iowa provide that a private citizen may make an arrest, first, for a public offense committed or attempted in his presence, and second, where a felony had been committed, and he has reasonable grounds for believing that the person to be arrested has committed it. Our statute further provides that a private person has the same right to make an arrest as a peace officer, when a public offense has been committed in his presence. So in this case, if you find from the evidence that some person or persons, on the 10th day of October, 1923, committed larceny of fowls from any building, shed, coop, or inclosed premises of the defendant, Metcalfe, then the defendant, Metcalfe, would be warranted in making resistance sufficient to prevent the offense of

taking his property, and to arrest any person or persons so committing such offense, if such offense was committed or attempted in his presence, and he would be justified or warranted in using sufficient force to compel such offender or offenders to desist, or to submit to arrest, and might use a deadly weapon in so doing.''

After a period of deliberation by the jury, it came before the court, and, through its foreman, presented the following interrogatory:

"To what extent would resistance have to be made, to enable the defendant to have a right to use a deadly weapon?"

Thereupon, the following proceedings were had:

"The Court: In answer to your question, I desire to call your attention to Par. 8-b of the instructions, and to withdraw the same from your consideration, down to and including the words written with pen and ink, as follows: 'And might use a deadly weapon in so doing,' and in place thereof, give to you the following instruction: 'You are instructed that the statutes of Iowa provide that a private citizen may make an arrest, first for a public offense committed or attempted in his presence, and second, where a felony has been committed, and he has reasonable grounds for believing that the person to be arrested has committed it.' Our statute further provides that a private person has the same right to make an arrest as a peace officer, when a public offense has been committed in his presence. So, in this case, if you find from the evidence that some person or persons, on the 10th day of October, 1923, committed larceny of fowls from any building, shed, coop, or inclosed premises of defendant, Metcalfe, then the defendant, Metcalfe, would be warranted in making resistance sufficient to prevent the taking of his property, and to arrest any person or persons so committing such offense, if such offense was committed or attempted in his presence, and he would be justified or warranted in using sufficient force to compel such offender or offenders to desist, or submit to arrest. The nature of the resistance, however, must have regard to the nature of the offense about to be committed. The crime of murder or manslaughter, according to circumstances, may be committed by the defendant, in opposing even an unlawful effort to carry away property. The owner may resist the taking, but not to the taking of life. So, in this case, if you find from the

evidence herein that some boys or men entered the shed or inclosure of the defendant and stole some of his chickens, and defendant, Metcalfe, commanded them to drop the chickens, and immediately fired a shot at the parties so running away, he might oppose the unlawful effort to carry away said property, but not to the extent of the taking of life. *He would not be justified in such emergency in employing a deadly weapon for such purpose.*"

The principal errors assigned for our consideration are directed to the foregoing additional instruction given to the jury.

It is to be noted first that the additional instruction was unfortunate in the emphasis which it placed upon the "taking of life." There was no "taking of life," nor did the indictment charge any such "taking." While this prohibition might properly have been applied to an assault with intent to take life, it was not in fact so confined. Disregarding, however, this feature of the instruction, we give attention to the concluding sentence:

"He would not be justified in such emergency in employing a deadly weapon for such purpose."

The court had, in preceding instructions, charged the jury that the defendant had a right to use necessary force to make an arrest for a felony committed in his presence, or to resist the taking and carrying away of his property. The necessary effect of the last sentence above quoted was to wholly take away from the defendant such privilege, *if he used a deadly weapon.* The legal effect of this latter instruction was to charge the jury peremptorily that the defendant was guilty *if he used a deadly weapon,* regardless of whether he intended to take life, or whether he intended only to offer reasonable resistance to the taking of his property, by inflicting a reasonable degree of bodily injury, and no more.

The question presented, therefore, is whether, if the injured party against whom a felony is being committed, both in the form of burglary and in the carrying away of his property from the burglarized building, in making resistance or attempted arrest, inflicts a moderate degree of bodily injury, reasonably necessary to his resistance, the mere fact that he used a deadly weapon, in the infliction of such bodily injury, terminates his privilege of resistance or arrest, and thereby renders him an unlawful aggressor against the wrongdoer.

Whether the defendant, in the case at bar, had a right to take human life, under the circumstances confronting him, or whether he had a right to intend to take human life, by the method of his resistance, are questions which are not now before us for decision. The question of intent to take human life was before the trial court, but was eliminated by the finding of the jury that there was no such intent. Though it be assumed that the instruction under consideration could have been applied properly to the question of intent to kill, yet it was not so confined in its application. The inhibition against the use of a deadly weapon was applied broadly; nor was there anything in any other instruction which would save to the defendant the right to inflict bodily injury in making lawful resistance to the carrying away of his property, if a deadly weapon was used, even though not in a deadly manner. The jury acquitted the defendant of any intent to commit homicide in any form, either as murder or manslaughter. But the jury had no chance to acquit him of wrongful assault, because, under the instruction of the court, the use of a deadly weapon was fatal to his claim of a lawful right of resistance. The only authorities relied on by the State in support of the instruction are our following cases: *State v. Thompson*, 9 Iowa 188; *State v. Vance*, 17 Iowa 138; *State v. Kennedy*, 20 Iowa 569. The foregoing were all cases of actual homicide. In each case, a verdict of manslaughter was rendered. What is said in the opinions in those cases must be read in the light of the uncontroverted fact of homicide in each case. The following excerpts from these cases will indicate the general nature of the discussion upon which the State relies. From *State v. Vance*, 17 Iowa 138, 144, we quote:

"Equally well settled is the proposition that a *bare trespass* against the property of another, not his dwelling, is not a sufficient provocation to warrant the owner in using a deadly weapon in its defense, and if he used such a weapon, *and kills the trespasser*, it will be murder, and this though the killing were actually necessary to prevent the trespass. If it appears that the intention was not to take life, but merely to chastise the trespasser, and to deter the offender from repeating the same, the offense may be extenuated, and will be no more than manslaughter. If the killing take place in the passion or heat of blood, it may be manslaughter, but cannot be less. Or, as the same prin-

.ciple ·is elsewhere expressed, trespass against property (not a dwelling house) is not such a provocation as will warrant the owner in using a deadly weapon. If he does so, *and death ensues*, it is murder, because an act of violence beyond the provocation. But, if the injury be inflicted with an instrument and in a manner not likely to kill, and the trespasser should, notwithstanding, happen to be killed, it will be no more than manslaughter, the law so far recognizing the adequacy of the provocation arising from the trespass. * * * The law always presumes that a party intended the probable and natural effects of his deliberate act; and when, therefore, the killing is deliberate, malice is presumed, and the crime is murder, unless sufficient excuse or provocation is shown. A homicide (amounting to murder or manslaughter, according to circumstances) may be committed, in opposing even an *unlawful* effort to carry away property. The owner may resist the taking, *but not to the taking of life.* And, as a party could not, in any emergency, lawfully employ a deadly weapon for such purpose, neither could he, it would seem, use it in the form of a threat, as to frighten or drive away those committing the waste. It is certainly true *that, if death should ensue* from the carelessness of the party in thus attempting to frighten the depredator, he would not be excused, though he had no intention of wounding or killing anyone. * * * Applying this proposition, thus briefly stated, *to cases of homicide*, and the rule is that every act of gross carelessness, even in the performance of what is lawful, and *a fortiori* of what is not lawful, and every negligent omission of a legal duty, *whereby death ensues, is indictable*, either as murder or manslaughter.''

From *State v. Thompson*, 9 Iowa 188, 192, we quote:

''*If it is not apparent, from the manner of the assault, the nature of the weapon used, and the like, that the assailant intended to commit a felony, that the danger was imminent, and that the species of resistance used was necessary to avert it*, the party assailed is not justified in resorting to the use of a deadly weapon and *using it in a deadly manner. United States v. Wiltberger*, 3 Washington, C. C. 521.''

The foregoing excerpts are sufficient to show that much of the discussion therein could not be intelligently applied to a case where homicide had not resulted. For instance, as above

indicated, it is held in *State v. Vance,* supra, that, if one were to use a deadly weapon carelessly, and only for the purpose of frightening away the wrongdoer, if death result from his carelessness, he becomes guilty of manslaughter. Surely it could not be said that the brandishing of a gun or other use of it for the purpose of frightening a wrongdoer in the commission of a felony would of itself be a wrongful act, in the absence of mortal result. The general rule is that the owner of property may lawfully resist the taking or carrying away thereof by a wrongdoer, and for that purpose he may use force. The degree of force which he may so use must not exceed what to a reasonable person would seem reasonably necessary, under the existing circumstances as they reasonably appear to the injured party. This right so conferred upon the injured party is subject to the prohibition that, for an ordinary trespass not involving force and not involving danger to his person, he may not take the life of the wrongdoer. In the case at bar, the trial court did not instruct the jury as to what degree of force the defendant could lawfully use, nor did it purport to state any rule on that subject for the guidance of the jury. Inasmuch as no homicide was committed, and none was intended, as found by the jury, the question remaining was whether the defendant used a degree of force that was unreasonable, under the rule stated, and whether he thereby inflicted a degree of injury that was not warranted by the circumstances, under the same rule. If yea, then the defendant lost his privilege of defense of property, and became, under the law, an unlawful aggressor. If nay, the defendant was entitled to an acquittal. But the question was one for the jury, under proper instructions. The defendant having in fact used a deadly weapon, though not in a deadly manner, such fact was proper for the consideration of the jury on the question whether his method of resistance was excessive. Such fact, however, did not, of itself, as a matter of law, render the defendant's defense of his property unlawful, even though it might have done so if homicide had resulted.

Direct authority upon the specific question now before us is surprisingly rare. No case has been cited to us in either brief, except such as involved actual homicide. Though the rule of law that applies in a case of homicide may have its proper influence upon a case resulting only in bodily injury, where

homicide was not intended, yet a distinction must be recognized between such a case and one of homicide; and such distinction is a proper one to be considered by the jury on the question whether, in the given case, the injured property owner used an excessive degree of force.

We have before us an opinion by the Supreme Court of Utah in the case of *State v. Terrell*, 55 Utah 314 (186 Pac. 108). This case is published in 25 A. L. R. 497, and is annotated by very extensive notes. The annotation purports to review all the authorities on the subject of the right of defense of person and property against felonious injury. It is manifestly impracticable for us to incorporate this review in this opinion.

Sufficient to say that the principal case thus annotated is very much in point upon the specific question under our present consideration. In that case, the defendant was convicted of the crime of assault with intent to inflict great bodily injury, as in this case. The circumstances of the shooting were very similar to those in the case at bar. The defendant was the owner of rabbits kept by him in pens within the curtilage of his dwelling house. He was guarding his pens at night against theft. For that purpose he improvised a bed near by. He was awakened in the night by a noise in his pens, which caused him to believe that a thief was present. He discharged his gun in the direction of the noise, pointing his gun toward the ground, so as to avoid taking the life of the thief. The charge took effect in one of the lower limbs of the thief. The thief proved to be a young boy of 14 years. On appeal, the judgment of conviction was reversed, on the ground that the question was one for the jury, whether, in so using his gun, the defendant used more force than was reasonably necessary, under all the circumstances surrounding the defendant, as they reasonably appeared to him at the time. The following quotations from the syllabus will be a sufficient indication of the holding of the court in that case:

"3. The question of the necessity of the shooting by an owner of a rabbit pen of one entering the pen in the nighttime is a question for the jury, upon all the testimony, under proper instructions from the court.

"4. Homicide in defense of property is justifiable if there exists in the mind of the slayer a reasonable belief that the necessity exists.

"5. No more force may be used in defense of property than may be reasonably necessary to repel an offender or prevent the commission of a crime, under a statute providing that sufficient resistance may be exercised to prevent an illegal attempt by force to take or injure property.

"6. Whether or not in a given case greater force is used in resisting an attempt to commit a crime than is reasonably necessary is a question of fact for the jury under proper instructions of the court.  * · * *

"8. Upon trial of one for shooting a boy in his rabbit pen at night, a requested instruction that, if when complaining witness was shot he was committing a burglary, accused was justified in shooting, should be given in conjunction with other statements of the law applicable to the facts and circumstances disclosed by the evidence."

We may add further that the cases which are reviewed in the annotation above referred to are nearly all cases which involve actual homicide. The rule indicated in the great majority of these cases is that, even in a case resulting in homicide, the controlling question is ordinarily one of fact, viz., whether, under the circumstances surrounding the injured property owner, as they reasonably appeared to him, he was justified in believing it necessary for him to take human life, to protect his property against violent seizure or asportation. The following excerpt from *Driggers v. United States*, 7 Ind. Ter. 752, 761 (104 S. W. 1166), is a succinct statement of the rule in that regard:

"'The jury are instructed that justifiable homicide is the killing of a human being in self-defense, or in the defense of habitation, property, or person, against one who manifestly intends or endeavors by violence or surprise to commit a felony on either. A bare fear of any of these offenses is not sufficient to justify the killing. It must appear that the circumstances, viewed from the defendant's standpoint, as they reasonably appear to him, were sufficient to excite the fears of a reasonable man, and that the defendant acted upon these reasonable appearances of danger.'"

In *State v. Taylor*, 143 Mo. 150, it was said in the syllabus:

"A mere civil trespass upon one's dwelling house does not justify him in slaying the trespasser. The owner may resist such a trespass, opposing force against force, but he has no

right to kill unless it becomes necessary to prevent a felonious destruction of property or the commission of a felony therein, or to defend himself against a felonious assault upon his person. * * * "

In *Brown v. State*, 55 Ark. 593, 601, it was said:

"Following the doctrine of the common law, the statute regards the violent attempt to enter the house as equivalent to an assault upon the person to be injured; and when it is obviously about to be made, he may at once put himself in an attitude to repel the aggressor. It was not practicable to give a rule applicable to all cases for determining what acts or conduct will constitute the actual attempt to enter a house. But it must be a 'manifest' attempt; and we take this to mean one so plainly made that no reasonable doubt will exist as to the purpose of the aggressor. At what point the effort to enter the house has begun, and how far it may be permitted to proceed with safety to the life or person of the individual assailed, must be determined by the circumstances of each case. *And these are questions more of fact than of law.*"

In *Fortune v. Commonwealth*, 133 Va. 669, 686 (112 S. E. 861), it was held:

"One in his own curtilage who is free from fault in bringing on the combat, when attacked by another, has the same right of conduct, without any retreat (i. e., to stand at bay and resist assault), even to the taking of life, that one has when within his own home."

While it has been held that the right to employ force in the defense of a person's habitation does not extend beyond the limits of the dwelling and the customary outbuildings [*State v. Bartmess* (1898), 33 Ore. 110 (54 Pac. 167)], a tobacco house within the owner's curtilage has been held entitled to all the privileges and protection, with reference to felonious acts committed against it, of the capital or dwelling house (*Parrish v. Commonwealth*, 81 Va. 1).

In *Crawford v. State*, 90 Ga. 701, 705 (35 Am. St. 242), the trial court had instructed that the right to kill, in defending against a robbery, would not exist after the possession of the property had passed from the owner to the person taking it. On appeal, it was held:

"This instruction, under the evidence in this case, was

improper; because no such change of possession as had taken place would cut off the right of the defendant to protect his property against a felonious taking, the property being still in his immediate presence, and the deceased being then engaged in severing that part of the meat which he had said it was his intention to take, and in resisting with his knife the efforts of the defendant to prevent him from carrying out this intention. The taking was not a past, but a present and progressing injury; and if the defendant acted under a reasonable belief that the purpose of the taking was robbery, he had the right to arrest it in the manner he did, although there may have been already such a change of possession as would in law amount to a robbery. The right of the owner of property to defend it against a felonious taking, to the extent, if necessary, of killing the person taking, does not end at the moment the guilt of that person is technically complete. It extends not merely to the prevention of such asportation as may be sufficient to render the person taking guilty of robbery, and which may be effected by the slightest change of possession, but to *the prevention of his carrying off the property which he has thus gotten from the owner.* The object of the law being to allow the owner to protect his property against the robber, it would be unreasonable to hold that, at the moment such asportation is accomplished, and before the robber has gotten away with the article taken, the right of the owner to defend his property is at an end; and that where, the moment before, he could lawfully kill in defense of it, he must yield after the slightest change of possession has been effected, and if he then killed the robber, to prevent the article from being carried off, would be guilty of murder.'"

    *Dinan v. Fitz Gibbon,* 63 Cal. 387, was a civil case, wherein the defendant was sued for damages for unlawful use of a dangerous weapon. The trial court had instructed the jury that "the very fact that the defendant used this unlawful weapon gives the plaintiff the right to recover." The weapon in question was a gun. On appeal, the judgment was reversed, for error in such instruction. The Supreme Court said:

    "The necessity of the force which was resorted to, to repel the 'encroachment' of the plaintiff upon the defendants' premises, and the question whether the defendants used more force and violence upon the person of the plaintiff than was necessary

for the protection of their property, *should have been left to the jury.* It was interfering with their constitutional right to determine all matters of fact, *for the court to instruct them that the mere use of the weapon to resist the encroachment of the plaintiff gave him the right to recover.*"

In the annotation herein referred to, at page 548, many authorities are cited, to the following proposition:

"Whether the force used by an owner of property, in its protection against aggression, was more than the attack thereon warranted, *is a question of fact for the jury to determine, under proper instructions from the court.*"

The foregoing is a sufficient indication of the general trend of the authorities on this question. All the authorities agree that the criterion of *necessity* which justifies the use of force by the injured property owner is the *apparent necessity*, and not the actual necessity. The necessity in fact may have been not so imminent as the injured property owner reasonably and in good faith believed it to be. He is to be judged, however, by what he himself, as a reasonably prudent man, in good faith, in the light of all the circumstances surrounding him, reasonably believed his necessity to be. And this question is usually a jury question. In the case at bar, no such question was submitted to the jury. The rule here indicated was not stated to the jury, nor was it in any manner referred to. This omission of itself would be a valid ground of error. When it is considered that the trial court threw into this void the concluding sentence of the additional instruction which we have already quoted, the error becomes greatly magnified. In stating to the jury, upon this record, that the defendant was not justified in using a deadly weapon, the court left no question of fact for the consideration of the jury.

It is to be borne in mind, in the consideration of this feature of the case, that, according to the evidence of the defendant, both larceny and burglary were being committed in his presence and within the curtilage of his dwelling; that the property seized by the thieves was still within his curtilage, and about to be carried away. Both the burglary and the larceny were felonies. The defendant not only had the right to use a reasonable degree of force to prevent the felonious carrying away of his property, but he had also the right to make the arrest of the

wrongdoers; and in the effort to make such arrest, his power, for the time being, was equivalent to that of an officer. Whether he was attempting to arrest the wrongdoer or was resisting the carrying away of his property, he had a right, in either event, to use a substantial degree of force; and this implies a right to inflict some degree of bodily injury. Whether he exceeded his prerogatives, under the circumstances, and used excessive force, or inflicted a greater injury than was reasonably necessary, as it reasonably appeared to him, became the controlling question in the case. We hold it to have been a question of fact, and that it should have been submitted to the jury.

We may add one further observation. A majority of the states of the Union have enacted statutes which expressly permit the use of force in the defense of one's possession of his property. These statutes, in the main, are mere confirmation of the pre-existing common law on the subject. They vary, however, to some extent in their terminology. The authorities which we have quoted from other jurisdictions speak generally with reference to particular statutes. Many of the statutes under consideration provide substantially that forcible resistance may be made by a party about to be injured, (1) to prevent an offense against his person; (2) to prevent an illegal attempt by *violence or surprise* to take or injure property in his lawful possession. Under our statute (Section 12922, Code of 1924), such resistance may be made:

"(1) To prevent an offense against his person.

"(2) To prevent an illegal attempt by *force* to take or injure property in his lawful possession."

It will be noted that, under the terminology of our statute, it is not essential that the attempted taking of property be by violence, in order to justify forcible resistance. It is enough that the attempted taking be by *force*. Though "violence" implies "force," yet "force" does not necessarily imply "violence." Burglary is a crime of force. The unlawful opening of a door for the purpose of larceny is a breaking. The seizure of personal property and the carrying of it away for the purpose of larceny implies the use of force. So far, therefore, as the mere terminology of our statute is concerned, it is more favorable to the injured party than are some of the statutes which have been under consideration in the cases from

which we have quoted above. The Utah statute under which *State v. Terrell,* supra, was decided, is identical with our statute in that regard. The restraint upon the use of deadly weapons is not statutory in any of the states. This rule of restraint is one which has been made and recognized by the courts, and had its origin in the common law. It has been promulgated, however, by the courts, not as a usurpation of the function of the jury, but as an aid to the jury in the performance of such function. Its purpose is to set a great price upon human life, and to require that the taking thereof shall not be lightly justified. With this rule before it, it is still incumbent upon the jury to say whether, under all the circumstances of the given case, the shooting was, nevertheless, justified. This is not saying that the undisputed evidence in a given record may not be such as to leave little room for the defendant's escape. However, the burden being at all times upon the State, the defendant is entitled to an instruction which shall set before the jury the rule or criterion by which the question of justification is to be determined.

Nor should court or jury, in the consideration of such question and the rule relating thereto, be unmindful of the disadvantage to which a property owner is put, and the peril to which he subjects his person, when he undertakes to protect his person and property, in the nighttime, against unscrupulous persons who are bent on plunder. These know no law, and observe none, except that of their own personal safety. It is true that, in the case at bar, the victim was an unintended target. Nor is it to be assumed that he was engaged in felony. But the criminality of the defendant is to be determined by what he himself intended. He cannot justify his shooting of Perry on the ground that it was accidental and unintended, even though he directed his shooting at another person. His criminality, if any, is the same as though the shooting had taken effect upon such other person. If he was justified in shooting at the supposed chicken thief, then he was no less justified merely because some of the shots found a concealed and unintended mark in the person of the prosecuting witness. The criterion by which his criminality must be judged is whether he reasonably believed himself to be dealing with the chicken thief who was in the act of taking away his poultry.

2. HOMICIDE: self-defense: defense of property: unintended victim.

The State seeks to some extent to meet this state of the record by comments on the evidence. It is suggested that there is no evidence in the record of any attempt by the defendant to arrest the alleged wrongdoers. Sufficient to say that the trial court instructed the jury on the theory that there was such evidence. The defendant lodged no complaint against that part of the instructions. He was not required, therefore, to incorporate into his abstract the record of the evidence pertaining thereto. We must presume, therefore, that the record did contain evidence which rendered such instruction proper. It is suggested also that the supposed chicken thieves described by the defendant were purely imaginary and nonexistent. This suggestion is predicated upon the testimony of the three boys that they saw none. The suggestion is not warranted by the record. It could as plausibly be suggested, as indeed the defendant contends, that the three boys were assisting in the theft, and were acting as watchers. Two disinterested witnesses corroborated the defendant, and testified to seeing the alleged chicken thieves in their flight. Moreover, the three boys were impeached by several witnesses, as being of bad moral character. Such testimony was allowed to stand uncontradicted. They appear in this record as willful trespassers on and destroyers of the defendant's property. If, therefore, the question of fact were for our consideration, we could not deem their evidence at this point highly credible. But this is quite beside the mark. If the evidence of the defendant had stood alone as to the burglary of his hen house and the larceny of the chickens therefrom, he would have been entitled to a submission of the case upon such theory of fact.

3. CRIMINAL LAW: appeal and error: instructions: presumption.

For the reasons herein indicated, the judgment below is, accordingly, reversed, and the cause remanded.—*Reversed and remanded.*

STEVENS, FAVILLE, DE GRAFF, and MORLING, JJ., concur.

ALBERT and VERMILION, JJ., not participating.